UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

State Farm Bank, F.S.B., a          :
Federal Savings Association,        :
and Nick Lopreiato,                 :
                Plaintiffs,         :
                                    :    Case No. 3:05cv808(JBA)
v.                                  :
                                    :
John P. Burke, Banking              :
Commissioner of the State of        :
Connecticut, in his official        :
capacity,                           :
                Defendant.          :

RULING AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT
[DOCS. ## 25, 28]

Plaintiffs State Farm Bank, F.S.B. ("State Farm"), a federal
savings association chartered under the Home Owners' Loan Act
("HOLA"), 12 U.S.C. § 1461 et seq., and Nick Lopreiato, an
exclusive agent of State Farm, bring this action for declaratory
and injunctive relief against defendant John P. Burke, in his
official capacity as Banking Commissioner of the State of
Connecticut ("Commissioner"), challenging on preemption grounds
the constitutionality of certain state statutes purporting to
regulate the activities of a federal savings association.[1] See
Amended Complaint, [Doc. # 33] at ¶ 1, Prayer for Relief 1 & 2.

The parties have filed cross motions for summary judgment

_____

[1] Plaintiffs' original complaint included a claim for relief
on the basis of 42 U.S.C. § 1983. See Complaint [Doc. # 1]. An
amended complaint deleted this claim for relief. See
Stipulation, attaching Amended Complaint [Doc. # 29]; Amended
Complaint [Doc. # 33].

1

[Docs. ## 25, 28] which focus on the deference due an opinion letter issued by the Office of Thrift Supervision ("OTS") – an instrumentality of the United States Department of the Treasury which pursuant to HOLA supervises, examines, and regulates federal savings associations, including State Farm. See OTS Opinion Letter, Amended Complaint, Ex. 1 at 1. In its letter, in reliance on factual information provided by State Farm, OTS concluded that:

> [W]hen [State Farm] uses agents in the manner [State Farm] has described to perform marketing, solicitation, and customer service activities related to [State Farm's] deposit and loan products and services and other authorized banking powers, state licensing and registration requirements that do not apply to [State Farm] also do not apply to [State Farm's] agents solely because they perform those activities for [State Farm].

See OTS Opinion Letter at 1.

As described below, because OTS's interpretation is one concerning the preemptive effect of its own regulations, the Court accords it "controlling weight" unless "plainly erroneous or inconsistent with [its] regulation[s]." Auer v. Robbins, 519 U.S. 452, 461 (1997). In light of HOLA's remarkably broad grant of authority to OTS, given that OTS's regulations are silent on this issue of preemption, and because of the particular facts in this record as to the relationship of control and oversight between State Farm and its exclusive agents, the Court concludes that OTS's interpretation is neither plainly erroneous nor inconsistent with its own regulations. Thus, plaintiff's Motion

2

for Summary Judgment [Doc. # 28] will be granted and defendant's Motion for Summary Judgment [Doc. # 25] will be denied.

## I.    FACTUAL BACKGROUND

In briefing their motions for summary judgment, the parties do not dispute the following facts.  State Farm is a federal savings association chartered under HOLA, is a wholly-owned subsidiary of State Farm Mutual Automobile Insurance Company, and is headquartered in Bloomington, Illinois.  State Farm markets and sells various deposit and loan products – such as mortgages and certificates of deposit ("CDs")[2] – including to customers in Connecticut.

As noted above, OTS has the authority to supervise, examine, and regulate federal savings associations and, at least with respect to the lending and deposit-related activities at issue here, OTS's regulation of federal savings associations explicitly preempts any state laws or regulations.  See 12 C.F.R. § 557.11 (b) ("OTS hereby occupies the entire field of federal savings associations' deposit-related regulations.  OTS intends to give federal savings associations maximum flexibility to exercise deposit-related powers according to a uniform federal scheme. Federal savings associations may exercise deposit-related powers

---

[2] The Federal Deposit Insurance Corporation ("FDIC") insures funds deposited into State Farm up to the legal limit, currently $100,000 per account-holder.  CDs that exceed the $100,000 FDIC limit are known as "jumbo CDs".

as authorized under federal law . . . without regard to state laws purporting to regulate or otherwise affect deposit activities, except to the extent provided in § 557.13.  State law includes any statute, regulation, ruling, order, or judicial decision.");[3] see also 12 C.F.R. § 560.2(a) (providing that OTS occupies the field of regulation of lending activities of federal savings associations).[4]  OTS regulations expressly provide that the "OTS preempts state laws that purport to impose requirements governing the following: . . . [s]tate licensing or registration requirements," (12 C.F.R. § 557.12(g)), "requirements regarding . . . [l]icensing, registration, filings, or reports by creditors," (12 C.F.R. § 560.2(b)(1)), or "[p]rocessing, origination, servicing, sale or purchase of, or investment or participation in, mortgages" (12 C.F.R. § 560.2(b)(10)).

State Farm markets its deposit and loan products through a network of exclusive agents.  Plaintiff Lopreiato is one such

---

[3] 12 C.F.R. § 557.11(b) exempts from preemption, "to the extent that the law only incidentally affects . . . deposit-related activities or is otherwise consistent with the purposes of § 557.11: (1) Contract and commercial law; (2) Tort law; and (3) Criminal law."  See 12 C.F.R. § 557.13.  Additionally, "OTS will not preempt any other state law if the OTS, upon review, finds that the law: (1) Furthers a vital state interest; and (2) Either only incidentally affects . . . deposit-related activities or is not otherwise contrary to the purposes expressed in § 557.11."  Id.

[4] 12 C.F.R. § 560.2 also provides for a limited exemption from preemption for lending-related activities, similar to the one described in note 3 supra.  See 12 C.F.R. § 560.2(c); see also 12 C.F.R. § 560.110.

4

agent and operates in Connecticut.  State Farm's agents typically provide information to customers regarding State Farm's products and services and provide ministerial assistance to customers in completing and submitting applications to State Farm, but do not evaluate loan applications, apply underwriting criteria, make lending decisions, or accept loan payments or deposits on behalf of State Farm.  Each agent is required to enter into an exclusive agency agreement with State Farm, which provides that "the relationship between the Bank and the Agent is that of a company and an independent contractor."  See Def L.R. 56(a) Stmt. [Doc. # 27] Ex. A at 3.  Accordingly, State Farm reports the income of its agents on Federal Tax Form 1099s.  Agents participate in State Farm in-house education and training programs and are subject to State Farm oversight and compliance programs, but are responsible for their own office overhead expenses.

Under the Examination Parity Act (the "Parity Act"), codified as Section 5(d)(7) of HOLA, OTS has the authority to regulate and examine the performance of third-party contractors, such as State Farm's agents.  Specifically, the Parity Act provides:

> [I]f a savings association, a subsidiary thereof, or any savings and loan affiliate or entity . . . that is regularly examined or subject to examination by the Director, causes to be performed for itself, by contract or otherwise, any service authorized under this chapter . . . whether on or off its premises - (i) such performance shall be subject to regulation and examination by the Director to the same extent as if such services were being performed by the

<u>savings association on its own premises</u> . . . .

12 U.S.C. § 1464(d)(7)(D) (emphasis added).

Defendant does not dispute that the Parity Act provides a basis for OTS to regulate and examine the services provided by State Farm's agents, but contends that those agents are also subject to Connecticut laws regulating the activities of mortgage brokers and the marketing of CDs.  Chapter 668 of the Banking Law of Connecticut, Conn. Gen. Stat. §36a-486 <u>et</u> <u>seq</u>., requires persons engaged in mortgage lending activities to be licensed by the State, pay annual license fees, meet bond, net worth and minimum experience requirements, and be subject to the regulation and oversight of the Commissioner.  <u>See</u> <u>id</u>. at §§ 36a-488, 36a-492, 36a-493, 36a-513, 36a-516.  The Commissioner has the authority to, after notice and hearing, suspend, revoke, or refuse to renew a license for, <u>inter</u> <u>alia</u>, fraud, misappropriation, or violations of the banking laws.  <u>See</u> <u>id</u>. at §§ 36a-51, 36a-494, 36a-517.  The Commissioner is also authorized to take measures to enforce the banking laws, including the imposition of civil penalties, issuance of cease-and-desist orders, and the institution of superior court actions for injunctive relief.  <u>See</u> <u>id</u>. at §§ 36a-50, 36a-52.

Additionally, the Commissioner has construed the Connecticut Uniform Securities Act ("CUSA"), Conn. Gen. Stat. §§ 36b-2-36b-33, to apply to the sale of CDs over $100,000 ("jumbo CDs") by

6

federal savings associations and their agents.[5]  Under the
Commissioner's interpretation, CUSA would require all State Farm
agents engaged in CD-related activities to be registered with the
Securities and Business Investments Division of the Connecticut
Department of Banking.

In response to an inquiry made on behalf of State Farm, on
October 25, 2004, OTS provided its Opinion Letter, concluding
that when State Farm uses its agents "to perform marketing,
solicitation, and customer service activities related to [State

---

[5] CUSA defines "security" as:
[A]ny note, stock, treasury stock, security future,
bond, debenture, evidence of indebtedness, certificate
of interest or participation in any profit-sharing
agreement, interests of limited partners in a limited
partnership, collateral-trust certificate,
preorganization certificate or subscription,
transferable share, investment contract, voting-trust
certificate, certificate of deposit for a security,
fractional undivided interest in oil, gas or other
mineral rights, put, call, straddle, option, or
privilege on any security or group or index of
securities, including any interest in or based on the
value of such security, group or index, put, call,
straddle, option or privilege entered into on a
national securities exchange relating to foreign
currency, or, in general, any interest or instrument
commonly known as a "security", or any certificate of
interest or participation in, temporary or interim
certificate for, receipt for, guarantee of, or warrant
or right to subscribe to or purchase, any of the
foregoing. "Security" includes (A) a certificated and
an uncertificated security, and (B) as an "investment
contract", an interest in a limited liability company
or limited liability partnership, but does not include
any insurance or endowment policy or annuity contract
issued by an insurance company that is subject to
regulation by the Insurance Commissioner.
Conn. Gen. Stat. § 36b-3(19).

Farm's] deposit and loan products and services and other authorized banking powers, state licensing and registration requirements that do not apply to [State Farm] also do not apply to [State Farm's] agents solely because they perform those activities for [State Farm]."  <u>See</u> Opinion Letter at 1.  The parties do not dispute that the state licensing and registration requirements at issue do not apply to activities undertaken by State Farm itself: the sole issue is whether these requirements apply to State Farm's agents or are preempted by OTS regulations.

## II.  DISCUSSION

### A.  Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Where – as here – the parties agree as to the material facts, summary judgment is appropriate.  <u>See</u> <u>Leebaert v. Harrington</u>, 332 F.3d 134, 139 (2d Cir. 2003) ("These [summary judgment] standards apply where, as here, the summary judgment motions are based on stipulated facts.").

### B.  Degree of Deference Due the OTS Opinion Letter

<u>1.   OTS Opinion Letter</u>

8

OTS premised its analysis of the preemption of state regulation of State Farm's agents on its understanding that, pursuant to HOLA, it has plenary authority over federal savings associations, such as State Farm, and their operations: "The comprehensiveness of the HOLA language demonstrates that Congress intended the federal scheme to be exclusive, leaving no room for state regulation, conflicting or complementary."  See id. at 5-7 & n.12 (citing Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982), and Barnett Bank of Marion Cty., N.A. v. Nelson, 517 U.S. 25, 31 (1996)).  OTS also observed that, as discussed above, it possesses statutory authority to regulate and examine third parties with which a federal savings association has contracted, including exclusive agents.  OTS explained that, "[g]iven the broad mandates provided by the HOLA and OTS regulations," federal savings associations are to decide how to structure their operations and conduct their business, including conducting their activities through subsidiaries and third-party independent contractors, to which state laws apply only to the extent they apply to the parent associations.  See id. at 7-9 (citing the Examination Parity Act, 12 U.S.C. §§ 1464(d)(7)(D), 1464(d)(7)E), 1464(d)(1)(A)).

OTS explained that because "[f]ederal savings associations have the ability to decide how they market and solicit their banking products and services, subject to OTS's regulatory

9

oversight," state licensing and regulatory requirements do not apply to an operating subsidiary of a federal savings association when conducting lending and deposit-related activities of the association.  Id. at 9-10 (state licensing and registration requirements do not apply to an operating subsidiary "in large part due to the control the association has over the operating subsidiary and the OTS-imposed operational restrictions that are on the operating subsidiary").[6]  OTS reasoned that this freedom from state regulation is applicable even where an association contracts with a third party to conduct certain of its activities, so long as the association exercises sufficient control over that third party agent.  Id.  OTS determined that this factual inquiry would be satisfied where, as in this case, "the Agents are exclusive, are required to undergo training, and are subject to the Association's supervision and control."  Id. at 10.  OTS referred to the fact that State Farm's agents are exclusive and market only State Farm's products and services, receive training in State Farm's products and in compliance laws, are subject to State Farm's compliance oversight and audit committee reviews, and "[n]o entity other than [State Farm]

_____

    [6] "To qualify as an operating subsidiary of a federal savings association, the association must own, directly or indirectly, more than 50% of the voting shares of the entity; no other person or entity may exercise effective operating control of the entity; and the entity may only engage in activities that are permissible for a federal savings association."  Id. at 9 n.29.

controls the Agents' performance of activities for [State Farm]."
Id. at 3, 12.

Accordingly, OTS concluded:

- "The Connecticut licensing and registration
  requirements at issue "interfere and conflict with the
  authority of [State Farm] to exercise its deposit and
  lending powers by limiting [State Farm's] ability to
  market its products and services in the manner it
  chooses, here, by using the Agents." Id. at 11.

- "The state requirements also thwart the congressional
  objective that OTS have exclusive responsibility for
  regulating the operations of federal savings
  associations." Id.

- "To the extent a state law purports to regulate the way
  in which a federal savings association can perform its
  authorized activities, the state law is an
  impermissible interference with association powers and
  with OTS's regulatory authority." Id.

OTS reasoned that, given the freedom of federal savings

associations to make business decisions regarding the manner in

which they will conduct their operations, such decisions "should

not result in the association being subjected to a hodgepodge of

state requirements" and "[a]n association should not be hamstrung

in the exercise of its authorized powers merely because it

chooses to market its products and services using agents whose

activities the association closely monitors and controls." Id.

According to OTS's letter, application of a uniform set of

federal laws and regulations "furthers both the 'best practices'

and safety and soundness objectives of the HOLA by enabling

federal thrifts to deliver low-cost credit to the public free

from undue regulatory duplication and burden." Id. at 12 & n.42 (citing Preamble to OTS Final Rule: "Lending and Investment," 61 Fed. Reg. 50951, 50965 (Sept. 30, 1996)).[7]

OTS thus determined that based on its review of the "facts, circumstances, and representations of [State Farm]," it was satisfied that State Farm exercises sufficient control over its exclusive agents "to warrant a finding that state licensing and registration requirements do not apply when the Agents perform marketing, solicitation, and customer assistance activities on behalf of the Association for the Association's banking products and services." Id. at 13, 14.

### 2.   Appropriate Degree of Deference

The parties dispute the appropriate degree of deference due the OTS Opinion Letter.  Plaintiffs contend that the OTS Opinion Letter is due the highest degree of deference, whereas defendant contends that the letter is due a lesser degree of deference, if any, for several reasons, including the fact that it is an informal opinion letter and not a regulation subjected to official rulemaking (including notice and comment) procedures,

---

[7] By way of supporting analogy, OTS referred to the authority of national banks to make loans, which includes the authority to use agents to market those loans, and an earlier agency determination that those agents "need not comply with a state licensing requirement." Id. at 12 & n.41 (citing 66 Fed. Reg. 28593, 28594-28596 (May 23, 2001), Letter dated May 18, 2001, from First Sr. Dep. Comptroller and Chief Counsel, Office of the Comptroller of the Currency, to National City Bank and Huntington National Bank).

and because it concerns interpretation of a regulation as
preempting state law.

An agency's interpretation of its own regulations, as
opposed to a federal statute, is typically given controlling
weight unless it is "plainly erroneous or inconsistent with the
regulation[s]." Auer v. Robbins, 519 U.S. 452, 461 (1997)
(regarding the Secretary of Labor's interpretation of a
regulation articulated in an amicus brief); Taylor v. Vermont
Dep't of Educ., 313 F.3d 768, 780 (2d Cir. 2002) (according
"controlling weight" to a policy letter drafted by the Department
of Education's Office of Special Education Programs regarding a
Department of Education regulation).  As articulated by the
Second Circuit, the rationale behind according this degree of
deference is the "presum[ption] that the power authoritatively to
interpret [its] own regulations is a component of the agency's
delegated lawmaking powers." Encarnacion v. Barnhart, 331 F.3d
78, 86-87 (2d Cir. 2003).  However, "[b]ecause it would make no
sense to presume that Congress had the general intent to delegate
to an agency the power to contradict Congress's clearly expressed
specific intent in some other matter, we will not defer when an
interpretation is clearly contrary to any statute." Id.

An agency's interpretation of its own regulations is
entitled to controlling weight "irrespective of the formality of
the procedures used in formulating the interpretation." Id.

13

(deferring to the interpretation of social security regulations proffered by the Social Security Commissioner in a committee report)(citing Taylor, 313 F.3d at 779-80 and Auer, 519 U.S. at 461).[8]  Defendant cites Christensen v. Harris County, 529 U.S. 576 (2000), for the proposition that an agency interpretation should not be accorded any deference when contained in an opinion letter and not in a formal regulation adopted after notice and comment rulemaking procedures.  However, Christensen has been distinguished by the Second Circuit on the basis that in Christensen "the [Supreme] Court first rejected the notion that Chevron deference was due an agency's informal interpretation of an ambiguous statute, and second held that deference to an agency interpretation of a regulation was required only if the regulation was ambiguous."  Taylor, 313 F.3d at 780 n.7 (emphasis in original).  The Second Circuit reasoned that "Christensen does

---

[8] Accord Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 14 (2d Cir. 2001) (noting, "this Court is bound by the SEC's interpretations of its regulations in its amicus briefs, unless they are plainly erroneous or inconsistent with the regulation[s]") (internal quotation and citation omitted); Esden v. Bank of Boston, 229 F.3d 154, 168 (2d Cir. 2000) (applying the Auer standard of deference to an IRS interpretation of its regulatory framework contained in a "[n]otice, rather than in new regulations or a revenue ruling"); Flagg v. Yonkers Savings & Loan Ass'n, F.A., 307 F. Supp. 2d 565, 576 (S.D.N.Y. 2004) (holding that the Auer standard of deference "extends to interpretative positions taken in opinion or policy letters issued by the agency," according deference to OTS opinion letters regarding the preemptive effect of various OTS regulations, and ultimately concluding that the regulations preempted state statutes), aff'd 396 F.3d 178 (2d Cir. 2005).

14

not overrule the longstanding rule regarding the deference
generally owed to an agency's reading of its own regulations . .
. and in fact distinguished <u>Auer</u> and <u>Bowles</u> on the ground that
the agency's interpretation of the regulation at issue in
<u>Christensen</u> was inconsistent with its unambiguous language.  In
post-<u>Christensen</u> cases, this Circuit has continued to hold that
the <u>Auer</u>/<u>Bowles</u> rule of deference is still in effect." <u>Id</u>.; <u>see
also</u> <u>Am. Express Co. v. United States</u>, 262 F.3d 1376, 1382-83
(Fed. Cir. 2001) (distinguishing <u>Christensen</u>, noting "[h]ere . .
. we are not dealing with an agency's interpretation of a statute
and issues of Chevron deference, but with the IRS's
interpretation of an ambiguous term in its own Revenue Procedure.
In such circumstances, substantial deference is paid to an
agency's interpretations reflected in informal rulings.") (citing
<u>Auer</u>, 519 U.S. at 461).

     Additionally, this standard of deference is applicable to
OTS's interpretation here notwithstanding that it concerns the
preemptive effect of its regulations.  The so-called "presumption
against preemption" is inoperable "when the State regulates in an
area where there has been a history of significant federal
presence," such as the regulation of federal savings
associations.  <u>See</u> <u>United States v. Locke</u>, 529 U.S. 89, 108
(2000); <u>Flagg v. Yonkers Savings & Loan Ass'n, F.A.</u>, 396 F.3d
178, 183 (2d Cir. 2005) ("The presumption against federal

preemption disappears, however, in fields of regulation that have been substantially occupied by federal authority for an extended period of time. . . . Regulation of federally chartered banks is one such area."). This is consistent with the broad authority given to OTS by Congress in HOLA to promulgate regulations concerning federal savings associations, and pursuant to which OTS "has promulgated regulations governing the powers and operations of every Federal savings and loan association from its cradle to its corporate grave." Fidelity Fed. Savings & Loan, Ass'n v. de la Cuesta ("de la Cuesta"), 458 U.S. 141, 145, 161 (1982) (also noting, "[i]t would have been difficult for Congress to give the Bank Board a broader mandate") (internal quotations and citations omitted).

Further, deference to an agency's interpretation concerning preemption is appropriate where the interpretation concerns the preemptive effect of the agency's own regulations, as opposed to an agency interpretation of a federal statute (in the form of a regulation or otherwise), which may not be entitled to deference. See Indus. Truck Ass'n, Inc. v. Henry, 125 F.3d 1305, 1311 (9th Cir. 1997) ("An agency's interpretation of the preemptive effect of its regulations is entitled to deference where Congress has delegated authority to the agency, the agency's interpretation is not contrary to a statute, and agency expertise is important in determining preemption.") (citing Medtronic, Inc. v. Lohr, 518

16

U.S. 470 (1996)).[9]

Thus, applying Auer, the Court will give OTS's interpretation of the preemptive effect of its regulations articulated in its Opinion Letter "controlling weight" unless it determines that OTS's interpretation is "plainly erroneous" or "inconsistent with the regulation[s]" in question.

### C.   Preemption

The doctrine of preemption has its roots in the Supremacy Clause of the Constitution, see de la Cuesta, 458 U.S. at 152; U.S. Const. art VI., cl. 2, and typically applies in three situations: "[w]here Congress has expressly preempted state law, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law, or where federal law conflicts with state law." Wachovia Bank, N.A. v. Burke, 414 F.3d 305, 313 (2d Cir. 2005). Federal regulations generally have no less preemptive effect than federal statutes.  See Flagg, 396 F.3d at 182 (citing de la Cuesta, 458 U.S. at 153-54).

In this case, OTS – via its opinion letter – attributes preemptive effect to certain of its regulations regarding the

---

[9] The cases cited by defendant, including Smiley v. Citibank (South Dakota), N.A., 517 U.S. 735 (1996), and Bankwest, Inc. v. Baker, 411 F.3d 1289 (11th Cir. 2005), are distinguishable on this basis as these cases concerned an agency's interpretation of the preemptive effect of a federal statute, not an agency regulation.

licensing and regulation of State Farm's agents.  Specifically, the relevant OTS regulations provide, inter alia:

- That OTS has "plenary and exclusive authority . . . to regulate all aspects of the operations of Federal savings associations."  12 C.F.R. § 545.2.

- That "OTS . . . occupies the entire field of federal savings associations' deposit-related regulations" and "the entire field of lending regulation for federal savings associations."  12 C.F.R. §§ 557.11(b), 560.2(a).

- That "OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations when appropriate to: (1) Facilitate the safe and sound operations of federal savings associations; (2) Enable federal savings associations to operate according to the best thrift institutions practices in the United States. . . ."  12 C.F.R. § 557.11(a); see also 12 C.F.R. § 560.2(a) ("To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices . . . OTS hereby occupies the entire field of lending regulation for federal savings associations.").

- That the types of state laws preempted by OTS regulations regarding lending and deposit-related activities of federal savings associations include "[s]tate licensing or registration requirements."  12 C.F.R. § 557.12(g); see also 12 C.F.R. § 560.2(b)(1) ("Licensing, registration, filings or report by creditors.").

- That "State law applies to operating subsidiaries [of federal savings associations] only to the extent it applies [to the parent federal savings association]." 12 C.F.R. § 559.3(n).

- That an "account or deposit insured by the Federal Deposit Insurance Corporation" is not a "security."  12 C.F.R. § 561.44.  See also 12 C.F.R. § 563g.1(a)(13) ("[A] security shall not include an account insured, in whole or in part, by the Federal Deposit Insurance Corporation.").

These regulations were issued pursuant to the statutory grant in HOLA giving OTS the authority to promulgate regulations providing "for the organization, incorporation, examination, operation, and regulation of associations to be known as Federal savings associations . . . giving primary consideration of the best practices of thrift institutions in the United States."  12 U.S.C. § 1464.

As a preliminary matter, the Court finds that, as required by Christensen, 529 U.S. 576, and its progeny, including Taylor, 313 F.3d 768, these OTS regulations are ambiguous on the question that is the subject of the OTS Opinion Letter, i.e., whether the regulations preempt state law regarding the licensing and other regulation of exclusive agents of federal savings associations, and therefore application of Auer deference is appropriate.  See Wells Fargo Bank of Texas, N.A. v. James, 321 F.3d 488, 494 (5th Cir. 2003) ("[W]here, as here, the regulation is ambiguous as to the precise issue in contest, an agency's interpretation of its own regulation is controlling unless it is clearly erroneous.").

1.   Regulation of Lending and Deposit-Related Activities

The Second Circuit has characterized the grant of power to OTS in HOLA, including the authority to promulgate regulations "to provide for the organization, incorporation, examination, operation, and regulation" of federal savings associations, see 12 U.S.C. § 1464, as "an extremely broad grant of power."  Flagg,

396 F.3d at 183; <u>see also</u> <u>de la Cuesta</u>, 458 U.S. at 161 ("[I]t

would have been difficult for Congress to give the [Federal Home

Loan] Bank Board [(OTS's predecessor)] a broader mandate.")

(internal quotation and citation omitted)).  Indeed, courts have

held that the regulatory control of OTS and its predecessor, the

Federal Home Loan Bank Board, "over federal savings and loan

associations is so pervasive as to leave no room for state

regulatory control."  <u>Conference of Fed. Savings & Loan Ass'ns v.</u>

<u>Stein</u>, 604 F.2d 1256, 1260 (9th Cir. 1979) (concluding that

"[t]he broad regulatory authority over federal associations

conferred upon the Bank Board by HOLA does wholly pre-empt the

field of regulatory control over these associations"), <u>aff'd</u> 445

U.S. 921 (1980); <u>accord</u> <u>Bank of America v. San Francisco</u>, 309

F.3d 551, 560 (9th Cir. 2002); <u>Boursiquot v. Citibank, F.S.B.</u>,

323 F. Supp. 2d 350, 355 (D. Conn. 2004) (holding that "[t]he

language of [12 C.F.R.] section 560.2(a) is unequivocal in its

intent to preempt all state laws affecting lending regulation for

federal savings associations").

Exercising this broad authority, OTS promulgated, <u>inter</u>

<u>alia</u>, the preemption regulations cited above which provide that

OTS has "plenary and exclusive authority . . . to regulate all

aspects of the operations of Federal savings associations" and

"[t]his exercise of . . . authority is preemptive of any state

law purporting to address the subject of the operations of a

Federal savings association."  12 C.F.R. § 545.2;[10] see also 12 C.F.R. §§ 557.11(b), 560.2(a) (OTS occupies the entire field of regulation of federal savings associations' lending and deposit-related activities).  OTS regulations also provide that federal savings associations and their operating subsidiaries may exercise their lending and deposit-related activities "without regard to state law purporting to regulate or otherwise affect" these activities, including state laws involving licensing or registration requirements.  See 12 C.F.R. §§ 557.11(b), 557.12(g), 560.2(a), 560.2(b)(1), 559.3(n).  Defendant does not challenge the validity of these regulations.

As discussed above, the OTS regulations are silent concerning their preemptive effect on state licensing, registration, and other requirements of exclusive agents of federal savings associations.  However, as defendant acknowledges, OTS does have the authority under the Examination Parity Act to regulate and examine the performance of such agents "to the same extent as if [their] services were being performed by the savings association on its own premises."  12 U.S.C. § 1464(d)(7)(D).  On the basis of this regulatory authority, OTS compares saving association agents to operating subsidiaries,

---

[10] This longstanding regulation was originally promulgated in 1983 by OTS's predecessor agency, the Federal Home Loan Bank Board.  See  OTS Opinion Letter at 6 & n.15, citing 48 Fed. Reg. 23032, 23058 (May 23, 1983).

stating: "[w]here an association exercises sufficient control over an agent's performance of authorized banking activities, the agent, like an operating subsidiary of a federal savings association, will be subject to OTS regulation and supervision, and federal preemption of state license and registration requirements applies to the agent, just as it would to an operating subsidiary."  OTS Opinion Letter at 13.  OTS concludes that "[b]ased on [its] review of the facts, circumstances, and representations of [State Farm] and its counsel in the instant matter, [OTS] is satisfied that [State Farm] exerts sufficient control over the Agents."  Id.

Defendant contests this analogy on the basis that third-party agents, unlike operating subsidiaries, are not owned by the savings association, nor are they employees, but are only independent contractors, and thus the extent of the savings association's control over its agents is not comparable to that over operating subsidiaries.  However, notwithstanding the clear differences between the corporate relationship of State Farm with its operating subsidiaries and that with its agents, and the tax status of the agents as independent contractors rather than employees, the record nevertheless demonstrates substantial functional similarity between the activities of operating subsidiaries and State Farm's exclusive agents, as well as sufficient indicia of State Farm control over its agents, to

22

justify OTS's conclusion that state regulation of the agents also would be preempted, particularly given HOLA's broad delegation of authority to OTS and the reporting and examination authority vested by the Parity Act.

For example, as described above, OTS's preemption position concerning regulation of the activities of operating subsidiaries is premised on, in addition to ownership, the fact that no other person or entity exercises control over the activities of the operating subsidiaries, that the subsidiaries only engage in activities permissible for a federal savings association to engage in, and that OTS has imposed operational restrictions on the operating subsidiaries.  Opinion Letter at 9.  Likewise, no other person or entity exercises control over the lending and deposit-related activities of the exclusive agents, the agents only engage in federal savings association-type activities, and the agents operate under operational restrictions (e.g., limitation on their duties) and are subject to OTS regulation and examination pursuant to the Parity Act.  Id. at 3, 12. Additionally, while State Farm does not own its exclusive agents, it exercises control over them in the form of mandatory training programs, compliance oversight, and audit committee review.  Id.

Thus, in light of HOLA's broad grant of regulatory authority to OTS to provide for the organization, incorporation, examination, operation, and regulation of federal savings

associations generally, coupled with case law concluding that the
regulatory control of OTS over federal savings association is "so
pervasive as to leave no room for state regulatory control,"
Conference of Fed. Savings & Loan Ass'ns, 604 F.2d at 1260, where
the Examination Parity Act also accords OTS the authority to
regulate the agents of federal savings associations, and given
the substantial control that State Farm itself exercises over its
exclusive agents, the interpretation provided in the OTS Opinion
Letter that state law is preempted as to the licensing,
registration, and other requirements of State Farm's agents is
not plainly erroneous and is consistent with the federal
statutory scheme regarding regulation of federal savings
associations, as provided in HOLA.  Nor is OTS's interpretation
inconsistent with its own regulations as such regulations are
silent on the issue of preemption with respect to agents but
pronounce occupation of the field of regulation of the operations
of federal savings associations, including the activities of
associations' operating subsidiaries, which are for these
purposes comparable to State Farm's agents.

    2.   Jumbo CDs

    Lastly, OTS concludes that defendant's construction of CUSA
as applicable to jumbo CDs conflicts with OTS's regulation
providing that "a security shall not include an account or
deposit insured by the Federal Deposit Insurance Corporation."

12 C.F.R. § 561.44; see also 12 C.F.R. § 563g.1(a)(13) ("[A] security shall not include an account insured, in whole or in part, by the Federal Deposit Insurance Corporation."). As is clear by comparing the plain language of the OTS regulations with defendant's construction of CUSA, including jumbo CDs under CUSA is inconsistent with OTS's definition of "security," which expressly excludes even those CDs that are partially insured by the FDIC.[11]

OTS's exclusion of CDs insured by the FDIC from the definition of "security" is consistent with federal securities laws, as interpreted by the Supreme Court in Marine Bank v. Weaver, 455 U.S. 551, 557-59 (1982) (holding that a certificate of deposit issued by a federally regulated bank did not constitute a security under Section 10(b) of the Securities Exchange Act of 1934). As the Second Circuit has noted, "[t]he crux of the Marine Bank decision is that federal banking regulations and federal deposit insurance eliminate the risk of loss to the investor, thereby obviating the need for the protection of the federal securities laws." Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230, 240 (2d Cir. 1985).

Further, while the defendant argues that the absence of full

_____

[11] Jumbo CDs are only partially insured because the FDIC only insures CDs up to $100,000.  See supra n.2.

FDIC insurance for jumbo CDs compels a determination that such CDs may constitute securities under the Supreme Court's definition in Marine Bank, see Def. Mem. of Law at 21, defendant places undue reliance on the existence, or absence, of FDIC insurance.  First, in addition to the existence of insurance, the Marine Bank Court emphasized the importance of "the comprehensive set of regulations governing the banking industry," dictating that "[d]eposits in federally regulated banks are protected by the reserve, reporting, and inspection requirements of the federal banking laws [and] advertising relating to the interest paid on deposits is also regulated."  See Marine Bank, 455 U.S. at 558.  When referring to the additional factor that "deposits are insured by the [FDIC]," the Supreme Court noted that "[s]ince its formation in 1933, nearly all depositors in failing banks insured by the FDIC have received payment in full, even payment for portions of their deposits above the amount insured."  Id. (emphasis added).

Additionally, as is the case with the jumbo CDs here, the CD at issue in Marine Bank was only partially FDIC-insured.  See id. at 552 & n.1 (the CD purchased was in the amount of $50,000 and the maximum amount of FDIC insurance provided for CDs at the time was $40,000).  Thus, while the existence of FDIC insurance was a factor in the Supreme Court's definition of "security," it was not determinative, and partial FDIC insurance is sufficient to

26

exempt a CD from the definition of "security" pursuant to the Supreme Court's decision in <u>Marine Bank</u>.

The preemptive effect of OTS's regulations as to state statutes concerning the lending and deposit-related activities of federal loan associations applies here to the defendant's construction of CUSA because if defendant is permitted to construe CUSA to include jumbo CDs, all State Farm agents engaged in CD-related activities would be required to comply with various Connecticut registration requirements.  As discussed above, according "controlling weight" to OTS's Opinion Letter, OTS's regulations preempt such registration requirements because they relate to the operation of federal loan associations.  Thus, given the preemptive effect of OTS regulations in the field of lending and deposit-related activities of federal savings associations generally, defendant's construction of CUSA to include jumbo CDs is also preempted.

    <u>3.   Summary</u>

Because the interpretation of the preemptive effect of OTS's regulations as articulated in the OTS Opinion Letter is neither plainly erroneous nor inconsistent with the underlying regulations, the Court accords that interpretation "controlling weight" and concludes that the OTS regulations preempt the Connecticut banking statutes as applied to the lending and deposit-related activities of State Farm's exclusive agents, such

27

as state licensing and registration requirements, and also
including defendant's construction of CUSA, Conn. Gen. Stat. §§
36b-2-36b-33, as discussed above.

## II.  CONCLUSION

For the foregoing reasons, defendant's motion for summary
judgment [Doc. # 25] is DENIED and plaintiffs' cross-motion for
summary judgment [Doc. # 28] is GRANTED.  Defendant and his
agents are permanently enjoined from:

(1)  Directly or indirectly regulating or attempting to
regulate the mortgage lending and deposit-related
activities of State Farm Bank, plaintiff Nick
LoPreiato, or other exclusive agents of State Farm
Bank; and

(2)  Requiring or attempting to require that exclusive
agents of State Farm Bank be licensed in order to sell
mortgage-related products and/or registered to sell
CDs, and to pay fees associated with licensing and
registration.

Judgment shall be entered in favor of plaintiffs and the
Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this 21st day of June, 2006.**

28